JUAN ROSARIO CRESPO ET AL., Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-64-246.    Decided June 21, 1967.

Board with instructions to refer it to the Committee for the purposes of making a determination to that effect.

*José Antonio Arabía* and *Carlos M. Díaz Lamoutte* for appellant. *Enrique Leo Henríquez* and *Amancio Arias Cestero* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Appellees Juan Rosario Crespo and Julio de Jesús Martínez filed a complaint against the Puerto Rico Water Resources Authority, claiming damages suffered by them as a result of an accident which occurred on February 3, 1961 in College Park Development. They alleged that the accident in question was due to the exclusive negligence of defendant, which, despite the multiple requests made to that effect and having received the money to pay for such expense, did not remove the high tension electric wiring nor did it increase its height from the ground, exposing, with such carelessness and negligence, the life and safety of the persons who worked there or visited the project of College Park Development.

Defendant answered denying the essential facts and alleged, on the contrary, among other affirmative defenses, that the accident was caused by the exclusive negligence of

the plaintiffs themselves or by the exclusive and/or combined negligence of third persons alien to defendant.

A trial was held jointly on the merits and after making findings of fact and conclusions of law, the trial court decided that the accident was due to the negligence of plaintiffs themselves and rendered judgment dismissing the complaints.

Plaintiffs moved for the reconsideration of said judgment and the court, after making new findings and in the light of the doctrine established in the case of *Widow of Dávila* v. *Water Resources Authority*, 90 P.R.R. 316 (1964), decided that plaintiffs were not negligent and that the accident was due to the exclusive negligence of defendant. It reconsidered its judgment and rendered another ordering defendant to pay the sum of $40,000 to plaintiff Juan Rosario Crespo and $25,000 to coplaintiff Julio de Jesús Martínez, plus the sum of $6,500 for attorney's fees, relying on the following findings:

"1.—The accident which gave rise to this suit occurred in Block 'E' of College Park Development in Río Piedras, on February 3, 1961.

"2.—At that time (and at the present time) block 'E' of said Development was crossed by electric lines of 38,000 volts, property of defendant, Water Resources Authority.

"3.—Plaintiffs, at the time of the accident, were employees of Interstate General Contractors. This entity carried out the urbanization works on the premises where the accident occurred. At the time it occurred, the first section of the Development had already been terminated and works were being carried out in the second section in which block 'E' is located. In this block, at the time of the accident the structures of the houses had already been built.

"4.—The blueprints of College Park Development were timely submitted to the Water Resources Authority and they were approved on April 6, 1960 subject to the ratification of the servitude for the existing transmission lines.

"From the time the drawings of the Development were submitted to it, the Water Resources Authority had knowledge of

the height at which the lines would run after the earth movement was carried out in the Development.

"5.—On June 29, 1960 Interstate General Contractors paid the Puerto Rico Water Resources Authority, according to a budget submitted to it by the latter, the amount of $1,884 for the installation of two type H structures in the aforesaid lines.

"6.—In December 1960, Interstate General Contractors, also in accordance with a budget submitted to it by the Water Resources Authority, paid to the latter the sum of $3,677 to increase the height of said lines.

"7.—The Water Resources Authority did not perform the work until after the accident occurred.

"8.—Prior to the accident several employees and officers of the Water Resources Authority, among others engineers Manuel Gatell and Juan Borrero, visited College Park Development on several occasions, for the purpose of preparing the budget and carrying the necessary material to put up the lines.

"9.—Engineer Manuel Gatell visited the Development for the first time in August 1960 and knew the height of the lines.

"10.—Plaintiffs formed part of a crew which was rectifying the area and boundaries of the lots and according to an agreement with employees of the Water Resources Authority who some days before had commenced to store the material for the work of putting up the lines, they were designating the landmarks where the new poles were to be installed.

"11.—This work of designating the landmarks where the poles were to be installed took about half an hour. For that purpose, plaintiff Juan Rosario Crespo was using a level rod of the ones commonly used in engineering.

"12.—This instrument consists of two wooden parts, one of which is embedded in the other. On the front and back the level has a metal sheet marked with numbers. The level, when closed, measures seven feet long and extended thirteen feet six inches.

"13.—The purpose of the numbers in the metal sheet is to take measures on the land.

"14.—While Juan Rosario Crespo held the level in an upright position, Julio de Jesús Martínez had to mark the num-

bers in the metal plate of the level with a nail according to the instructions given him by another employee who was engaged in taking the measures with a transit. While this task was carried out, Rosario Crespo had to raise and lower the rod, the inferior extreme of which when at rest, that is, without being raised or lowered, was about from two to three feet from the ground. The movement of the rod upwards or downwards fluctuated between one or two feet.

"15.—In one of these upward motions, Rosario Crespo received a strong discharge from the 38,000 volt line.

"16.—Part of the discharge was transmitted to de Jesús Martínez who was crouching, through the nail with which he was marking the numbers of the level rod.

"17.—According to the provision of the 'National Electric Safety Code,' the minimum height at which the conductors of electric energy of 38,000 volts should be in the rural zone is seventeen (17) feet. In other zones the minimum height for the same voltage should be twenty-two feet. At the place where the accident occurred the lines were at a height of not more than eighteen (18) feet.

"18.—The section where the accident occurred, although at the time of the installation of the original lines, which were installed more than 25 years ago, was a rural zone, it had ceased to be so because several developments had been constructed in said section, among them, Santa María, the first section of College Park, and the structures of the second section.

"19.—As a result of the accident Juan Rosario Crespo suffered third degree burns covering 33⅓% of his body. He had to be submitted to different operations in order to amputate the fourth and fifth toes of both feet. Moreover he was submitted to several operations in order to make skin grafts, all of which left visible scars, among others, one eight inches long by three inches wide on the left thigh, another three and one-fourth inches long by one inch wide on the abdomen, another six inches wide which extends from the elbow to the wrist of the right arm, others on the hands including the fourth and fifth fingers, another one eleven inches long by eight inches wide on the right thigh. On his left leg he has a scar extending from the lower part of said leg through the ankle to the foot. The ankle of the left leg is entirely ankylosed. In order to walk

this plaintiff uses metal supports and orthopedic shoes which he will have to use for the rest of his life. He was hospitalized from February 3, 1961 to July 19, 1961, continuing under ambulatory treatment from July 19, 1961 to April 2, 1962. Juan Rosario Crespo was earning $44 weekly and has not been able to work since the accident because he has a disability of 40% of his general physiological functions which bars him from performing his usual work.

"20.—Julio de Jesús Martínez suffered serious burns which cover 33⅓% of the entire body, which have left numerous scars, among others a deep circular scar which measures about five inches long by five inches wide on the left side of his chest and another one on the same side seven inches long by seven inches wide. On the right hand he has burn scars in the wrist and on the hand on both sides and on the middle finger, as well as on the fourth and fifth fingers. On the left arm, he has a scar which extends from near the elbow to the wrist. He has other scars on the upper part of the left arm extending from the elbow to the shoulder. The shoulder, as a result of the burns is limited in movement. On the left hand he has burn scars extending from the wrist to the back of the left fifth finger, which is also limited in movement. On the thigh he has a scar seven inches long by eight inches wide. Likewise he has burn scars on the sole of the left foot. He has more burn scars on the right ankle and on the toe of the right foot. He was submitted to operations and was hospitalized from February 3, 1961 to April 14, 1961 and received ambulatory treatment until June 13, of the same year. He was discharged finally on July 6, 1961. During all the time he was hospitalized and under treatment, he did not go to work where he was earning $39 a week. As a whole he did not receive income for the amount of $858. He has a disability of 25% of his general physiological functions.

"21.—The injuries suffered by both plaintiffs are extremely painful." (Civil Case No. 62-8607, pp. 84–89.)

We issued a writ to review the aforesaid judgment.

Appellant assigns the commission of eight errors.

We shall discuss in the first place the seventh error in which it is alleged that the claim of coplaintiff, Julio de

Jesús Martínez, has prescribed and that the trial court committed error in not dismissing it as requested.

The accident which gave rise to the cause of action of said coplaintiff occurred on February 3, 1961. The complaint was filed in the Superior Court, San Juan Part, on December 2, 1962. In the complaint it was alleged and it was established at the trial that the aforesaid coplaintiff, Julio de Jesús Martínez, had made an extrajudicial claim against defendant, within the prescriptive term of one year, through a registered letter return receipt.

The theory of defendant-appellant is that although § 1873 of the Civil Code (31 L.P.R.A. § 5303) provides that prescription of actions is interrupted by their institution before the courts, *by extrajudicial claim of the creditor*, and by any act of acknowledgment of the debt by the debtor, the coplaintiff is not defendant's creditor because the obligation required from it is not liquid and that whenever the prescriptive term has been interrupted through the mere extrajudicial claim of the creditor, the action has been based on a relation relative to the obligation or nexus previously existing between the parties.

We do not agree.

In the case of *Cruz* v. *González*, 66 P.R.R. 203 (1946), the complaint filed against the assured and the insurance company was dismissed because the cause of action had prescribed. Interruption of prescription through extrajudicial claim made within the period of prescription against the insurance company was alleged by plaintiff. This Court said in that case:

"Appellant contends that the lower court erred in deciding that the action had prescribed. She argues in the first place that, although the complaint was filed more than one year after the accident, it avers an extrajudicial claim which interrupted the period of prescription. The extrajudicial claim was made against one of the defendant parties alone, that is, against the company

which insured the damages caused by the truck belonging to another defendant. .

"The lower court decided that the claim filed against the insurance company did not interrupt the period of prescription, inasmuch as the insurer was not the debtor of the plaintiff, nor was the latter the former's creditor. Appellant urges that she is the creditor of the insurer particularly in view of § 175 of the Insurance Law of Puerto Rico under which a claim may be filed jointly against the insurer and the assured. But assuming, without deciding, that the appellant is the insurer's creditor and that her extrajudicial claim interrupted the period of prescription, and hence the action against the insurer is not barred, the action is still barred as against the assured, and, consequently, the complaint does not state a cause of action either against the assured or against the insurer, inasmuch as the latter is liable only if the former is." (Pp. 204, 205.)

In *Suárez* v. *Pereira*, 66 P.R.R. 227 (1946), distinguishing it from *Cruz* v. *González, supra*, it was decided that the prescription of the action had been interrupted because the assured as well as the insurance company, the latter acting as the former's agent, had admitted their liability by virtue of extrajudicial claims before the period of prescription had elapsed.

In *Bithorn* v. *Santana*, 68 P.R.R. 281 (1948), the complaint for damages was filed more than one year after the occurrence of the accident. It was held that the action had prescribed. At page 285, it was said:

"The only other basis on which the plaintiff could prevail is that he had made an extrajudicial claim against the creditor which interrupted the running of the statute of limitations. We assume, without deciding, that the plaintiff in a damage suit is the creditor of the insurer and that an extrajudicial claim by the plaintiff to the insurer would interrupt the period of prescription for a suit against the insurer. But the liability of the insurer is contingent upon the liability of the assured. Hence, if no extrajudicial claim is made to the assured and the claim against the latter is barred, there can be no cause of action against either the assured or the insurer, despite the fact

that theoretically the claim against the insurer is still alive because prescription was interrupted as to him by the extrajudicial claim addressed to him alone. This is because, as we have seen, the liability of the insurer is predicated on the liability of the assured. Once a claim against the latter is barred, the matter is ended. *Cruz* v. *González et al.,* 66 P.R.R. 203, 205.

"We must therefore seek to determine if an extrajudicial claim was made to the assured. The complaint alleges such a claim only on the day following the accident. Except for the statement that the plaintiff had informed the insurer of the protest of the assured because the former had made no investigation as requested by the plaintiff, the remaining allegations of the complaint on this point are confined to requests made by the plaintiff to the insurer on unspecified dates. We find nothing in these allegations amounting to an extrajudicial claim directly to the assured within a year prior to the filing of the amended complaint."

■ The question which the Court did not decide in said cases was whether the plaintiff in a suit for damages was the creditor of the insurer. Under the legislation then in force the insurer's liability was subsidiary to/and contingent on the assured's liability. Prior to 1952, date in which § 175 of the Insurance Law of 1921 was amended, a complaint against the insurer alone where no final judgment had been previously obtained against the assured, did not state a cause of action. The law has changed. See Insurance Code, 26 L.P.R.A. § 2001 *et seq.* Whether the plaintiff was a creditor of the insured tort-feasor was not discussed in said cases. However, those decisions, especially in the *Bithorn* case, *supra,* relied on the fact that prescription was not interrupted because no extrajudicial claim was made against the insured. In *Bithorn* it was said that in order to decide the question of prescription it should be determined whether an extrajudicial claim had been made against the assured, it being concluded that it had not been made. Therefore, this Court did not doubt then, nor does it

doubt now, that in obligations arising from fault or negligence, the one who endures the damages is a creditor of the tort-feasor thereof, who is his debtor and is bound to repair them. Consequently, an extrajudicial claim made against the tort-feasor, within the year after the accident occurred, as was made in this case, interrupts the period of prescription.

Now we will discuss jointly the first and fourth errors assigned, as follows:

### First Error

"The trial court erred in changing and substituting some of its Findings of Fact of its Judgment of June 25, 1964, by other contradictory findings of its Judgment of November 13, 1964; and likewise making other Findings of Fact different from and contradictory to those of the Judgment of June 25, 1964, in the absence of evidence therefor."

### Fourth Error

"The court erred in reconsidering its Judgment of June 25, 1964."

Discussing the first error appellant sets forth several findings of fact made on reconsideration which, in its opinion, besides being in conflict with the original findings, are not supported by the evidence. We shall discuss this later.

Arguing the fourth error appellant maintains that on reconsideration the trial court is not empowered to alter or modify the juridical facts of the case without introducing additional evidence where said facts are supported by the evidence already weighed, unless the findings of fact are clearly erroneous or do not represent the most rational, fair, and juridical balance of the entire evidence received.

It sustains the same view as to the motion under Rule 43.2 of the Rules of Civil Procedure for the court to determine additional facts. "Its purpose,"—it argues—"is to amend findings of fact previously made for the purpose of

adding other facts on which the court did not make any finding. The purpose of this procedural provision is not to weigh again the evidence on the merits and to make different findings of fact contradictory among themselves."

Appellant is not right.

By provision of Rule 43.1 of Civil Procedure in all actions the court shall find the facts proved and state separately its conclusions of law thereon and shall direct the entry of the appropriate judgment.

However, the court is empowered to amend or make additional findings. For that purpose, Rule 43.2 provides the following:

"It shall not be necessary to request a statement of the findings of fact for the purposes of an appeal, but, upon motion of a party made not later than 10 days after entry of copy of the notice of judgment, the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for reconsideration or for a new trial pursuant to Rules 47 and 48 respectively. In either case, the sufficiency of the evidence to support the findings may thereafter be raised even though the party raising the question has made no objection in the lower court, or has not made a motion to amend them or a motion for judgment." (Rules of Civil Procedure [32 L.P.R.A. (1966 Supp.), p. 185].)

There is a close relation, as respects the power of the court to amend or change its findings as well as the judgment, between this Rule 43.2 and Rule 47, which empowers the court to reconsider its orders and judgments, and Rule 48.1 which empowers it to grant a new trial, among other reasons, "(c) when substantial justice requires it."

With such an ample power vested in the court, a restrictive view to the effect that a court cannot change its findings of fact, if it believes it was wrong in weighing the evidence, could not be adopted. The determining factor in that case would be whether the new findings and, hence, the

judgment rendered on reconsideration are supported by the evidence admitted, and the findings of fact are not clearly erroneous. See 5 Moore, Federal Practice 2685, § 52.11(2).

We turn now to consider the new findings of fact made on reconsideration which according to appellant are not supported by the evidence, and what would be its effect as to defendant-appellant's liability.

Findings of fact numbers 6 and 7 to the effect that Interstate General Contractors paid to the Water Resources Authority in order to increase the height of the electric lines and that defendant did not carry out the works until after the accident occurred are challenged in the first place. In fact, the evidence reveals that Interstate General Contractors paid to defendant to relocate as well as to raise the height of the electric lines and that the works were stopped before the accident occurred, according to plaintiffs' own evidence, by the directors of the project, particularly by Mr. Townsend. Nevertheless, and as we shall indicate further on, those facts are not decisive as to the liability which appellant may have in the occurrence of the accident.

The new finding of fact increasing the percentage of disability suffered by plaintiffs is also challenged but this new finding is supported at length by the evidence.

Other new findings of fact were (1) that the Water Resources Authority had knowledge of the height of the lines after the earthworks were carried out, (2) that the work of relocating the landmarks where the poles were to be installed took half an hour, (3) that defendant did not take the necessary measures to prevent the accident, such as discontinuance of the electric service through the 38,000 volt lines during half an hour while the works of locating the landmarks where the poles were to be installed were carried out.

We shall discuss further on how defendant's liability is affected by this new findings of fact. For the present it suffices to set forth that regardless of the fact that the Water Resources Authority had knowledge of the height at which the lines would stand after the earthworks were carried out, it did know, according to its own evidence, that the height of the lines over Block E at the place where the accident took place was 18 feet. Neither the time taken for the work of fixing the landmarks where the poles were to be installed nor the discontinuance of the electric service during that time are unique factors for fixing defendant's liability in this case.

We shall also discuss jointly the second, third, fifth, and sixth errors. They were stated thus:

### Second Error

"The court erred in determining that defendant was negligent and in applying the well established rule of *Colón Widow of Dávila* v. *Water Resources Authority,* decided on May 7, 1964, and in failing to apply the rule of law concerning findings."

### Third Error

"The court erred in not concluding as a question of law, as it had previously concluded in its Judgment of June 25, 1964, that plaintiffs were negligent."

### Fifth Error

"The court erred in awarding excessive compensations to plaintiffs."

### Sixth Error

"The court erred in ordering defendant to pay attorney's fees."

Appellant is seeking to distinguish the facts of the case of *Widow of Dávila* v. *Water Resources Authority, supra,* from those of the instant case and in fact they differ in many

aspects but that difference is not sufficient to relieve it of any liability.

■ The following are uncontroverted facts: that the day of the accident the plaintiff workers were, together with other workers, carrying out work on an area of Block E of the Development, either leveling a slope, as some appellees' witnesses testified, or locating the landmarks where the new poles for the relocation of the electric lines were to be installed, according to the finding of the trial court. At the place where the accident occurred the lines were at a height of not more than 18 feet. Before the earthworks in the development the height of the lines at that place was more than 18 feet and did not offer any danger; but in the work which plaintiff-workers were performing with the level rod there was the risk that said instrument could come in contact with or so near to the wires of the electric lines, causing an accident like the one suffered by plaintiffs. The latter, however, did not take measures to prevent the accident, the electric wires being, as they were, visible to them. On the other hand, the subdividers permitted the workers to carry out their work at the place where the accident could occur, being aware thereof because it was a fact known by them, that in that place the height of the electric lines was not more than 18 feet. There was, then, negligence on the part of plaintiffs as well as of their employer, Interstate General Contractors. Since it was an insured employer, it was not liable for the damages caused to its employees as a result of its negligence. *Cortijo Walker* v. *Water Resources Authority*, 91 P.R.R. 557 (1964). That, however, was not the only negligence causing the damage suffered by plaintiffs.

Defendant had knowledge, according to its own evidence, of the height at which the transmission lines of electric current would be after the earthworks were carried out and likewise it had knowledge that in the section of Block E

through which the lines passed the subdividers were carrying out works, to the extreme that already, at the time of the accident, there were houses built on that section. Despite that fact, defendant did not take any measure to prevent the foreseeable accidents which might be caused by the electric lines by reason of their height. Its liability, however, is limited to the proportion in which its negligence contributed in producing the damage suffered by plaintiffs. *Widow of Andino* v. *Water Resources Authority*, 93 P.R.R. 168 (1966).

The proportion in which defendant's negligence contributed to the damage is minimum as compared to the negligence of the subdividers and that of plaintiffs themselves, and the same should not exceed twenty percent. Compare with *Widow of Dávila* v. *Water Resources Authority, supra.*

Likewise the trial court did not err in ordering defendant to pay a sum for attorney's fees. However, the amount of $6,500 awarded is excessive and should be reduced to $3,000.

■ The eighth and last assignment of error lacks merits. The evidence shows that plaintiffs were not workers of the defendant nor did they work at the time the accident occurred for it nor under its direction. Plaintiffs were workers insured by their employer, Interstate General Contractors, and as such they were compensated by the State Insurance Fund. Defendant was not, in relation to plaintiffs, an insured employer and, hence, covered by the immunity granted by the Workmen's Accident Compensation Act to insured employers.

On the grounds stated, the judgment rendered by the Superior Court will be modified in the terms set forth in this opinion, and as thus modified it will be affirmed.